## Commissioner of Revenue *vs.* Jafra Cosmetics, Inc.

Suffolk. November 10, 2000. - January 25, 2001.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, & Sosman, JJ.

*Taxation,* Sales and use tax, Abatement. *Words,* "Representative."

This court concluded that certain "consultants" who sold an out-of-State taxpayer's products in Massachusetts were the taxpayer's "representatives" within the meaning of G. L. c. 64H, § 1 (5), as amended by St. 1971, c. 555, § 40, based on the nature and extent of the taxpayer's involvement with the in-State consultants demonstrated on the record of a proceeding before the Appellate Tax Board; consequently, the taxpayer was not entitled to a rebate of sales and use taxes for certain tax years. [258-265]

Appeal from a decision of the Appellate Tax Board.

The Supreme Judicial Court granted an application for direct appellate review.

*Pierce O. Cray,* Assistant Attorney General, for Commissioner of Revenue.

*Jonathan M. Zorn* (*Steven A. Kaufman* with him) for the taxpayer.

Spina, J. The Commissioner of Revenue (commissioner) appeals, pursuant to G. L. c. 58A, § 13, from a decision by the Appellate Tax Board (board) granting Jafra Cosmetics, Inc. (taxpayer), an abatement of sales and use taxes assessed from 1967 to 1982.[1] The board concluded that the consultants who sold the taxpayer's products in Massachusetts, who within the taxpayer's organization are the only persons authorized to make

---

[1] In 1984, the commissioner issued a notice of failure to file returns for sales and use tax for the tax period at issue. In 1986, the commissioner issued a notice of intention to assess sales and use tax and made its assessment in 1987. The Gillette Company paid the assessment in full on behalf of its subsidiary in 1987. The taxpayer filed an application for an abatement that the commissioner denied in 1990. Although the taxpayer timely appealed from the denial of the application, the hearing before the board was not held until January, 1999. There is no explanation in the record for this nine-year delay.

such sales, were not "representatives" within the meaning of G. L. c. 64H, § 1 (5), because they were not contractually obligated to sell and they had no authority to bind the taxpayer.[2] We hold that, as matter of law, the board incorrectly construed the term and we therefore reverse.

1. *Facts.* The taxpayer, a California corporation and wholly-owned subsidiary of the Massachusetts-based Gillette Company, manufactured a line of cosmetics and skin care products. The taxpayer sold its products through a sales force of independent contractors, referred to as "consultants," who in turn marketed the products through what is called the "direct selling method." Consultants were entry level independent contractors whose compensation was the difference between the wholesale prices charged by the taxpayer and the retail prices at which the products were sold to the consumer.[3] Managers were consultants who met the taxpayer's requirements for promotion and could thereby receive an additional commission from the taxpayer equal to a certain percentage of the wholesale value of their sponsored consultants' sales.[4] District directors were managers who had satisfied additional criteria and they earned a guaranteed, fixed commission of between $12,000 and $25,000

[2]From 1967 to 1971, a vendor was "engaged in business in the commonwealth" if it sold "tangible personal property at retail in the commonwealth, or any activity in connection therewith" including but not limited to "having any representative, agent, salesman, canvasser or solicitor operating in the commonwealth for the purpose of selling, delivering or taking orders for tangible personal property." G. L. c. 64H, § 1 (5), inserted by St. 1967, c. 757, § 1. From 1971 to 1988, which includes all remaining years relevant to this case, a vendor was "engaged in business in the commonwealth" if it "regularly solicit[ed] orders for the sale of tangible personal property by salesmen, solicitors or representatives in the commonwealth, unless such activity consist[ed] solely of solicitation by direct mail or advertising via newspapers, radio or television." G. L. c. 64H, § 1 (5), as amended by St. 1971, c. 555, § 40.

[3]The guidelines for active consultant status, incorporated by reference into the agreement signed by each consultant, stated that, in order to remain active, a consultant was required to teach twenty-five classes per year, attend regular meetings, and submit weekly reports. The board found that these guidelines were not rigidly enforced and that no consequences flowed from a consultant's failure to meet this quota. It was undisputed, however, that the guidelines accurately captured the taxpayer's strong suggestion that strict adherence to the guidelines was the best path to success as a Jafra consultant.

[4]Consultants who wished to be promoted were required to teach fifty-two classes per year. There was no evidence that the requirements for promotion were not strictly enforced.

per year. At the highest levels, they also received paid health insurance. During the assessment period, employees of the taxpayer held meetings in the Commonwealth for the local sales force, oversaw and attended training sessions organized by the consultants, and distributed bonus and motivational gifts. Employees did not personally solicit or collect orders for sales.

Consultants[5] were prohibited by contract from selling through wholesale or retail establishments. The most common direct selling method was to hold classes in private homes during which consultants gave facials, make-up demonstrations, and advice about proper skin care with the purpose of soliciting orders for the products. Consumers could make subsequent purchases by contacting the consultant directly. After a customer placed an order, the consultant would send the order to the taxpayer in California for acceptance. Consultants could either prepay the order or pay for it within seven days of its receipt.

The legal relationship between the taxpayer and its consultants was governed by a one-page "Independent Consultant Agreement" (agreement). The agreement stated that "the Consultant has no authority to obligate Jafra in any way," "Jafra is not responsible for Consultant's activities," and the "Consultant shall assume full responsibility for collecting any taxes on goods sold that are taxable."[6] In contrast, § 10 of the agreement placed certain burdens and limitations on a consultant's activities.[7]

At the hearing before the board, the taxpayer offered

---

[5]The term "consultant" is used throughout this opinion to refer to all of the taxpayer's independent contractors, regardless of their rank within the taxpayer's organization.

[6]At the hearing, a former employee who had been located in the Commonwealth testified that she collected sales tax in Massachusetts during the short period she was a consultant. The commissioner has stipulated that he will abate any other instances of double taxation brought to his attention.

[7]Section 10 of the Independent Consultant Agreement reads in full:

> "Consultant recognizes the importance of creating and maintaining the goodwill of clients toward Jafra. It is understood that Jafra is a direct selling company whose marketing plans and success depend upon the Consultants personally demonstrating Jafra products to the ultimate consumer as part of the Jafra skin care program. It is agreed that Consultant will put forth best efforts in servicing clients. For these reasons, Consultant agrees to demonstrate and sell Jafra products utilizing the direct selling method, and agrees to be bound by the Guidelines for Active Consultant Status as they may be amended from time to time. Consultant agrees to sell Jafra products to the ultimate consumer

testimony that the guidelines referred to in § 10 merely contained the taxpayer's suggestions on how to best succeed in business but that none was rigidly enforced. The consultant guide in which these guidelines were printed was admitted in evidence at the hearing, as was the manager guide that described the business opportunities and increased compensation available for individuals who qualified for such positions.

In its decision, the board concluded that the consultants were not "representatives" under G. L. c. 64H, § 1 (5), and that the taxpayer was entitled to an abatement of the approximately $500,000 in sales and use tax plus interest and penalties assessed against it for the $4,000,000 in sales made in the Commonwealth between 1967 and 1982. The board construed the term "representative" to refer to "an individual clothed in some authority vested by another to deal on its behalf. Within the scope of [her] authority, a representative can act as if [she] were the principal, i.e., fix the principal's legal relations with third parties. A representative is someone entrusted by the principal with the ability to conduct certain matters as full delegee." The board determined that the consultants were not representatives because they had no authority to act for the taxpayer and could not obligate the taxpayer. Correspondingly, it also found that the taxpayer had no control over the sales activities of the consultants. According to the board, the independent status of the consultants was dispositive of the question whether they were representatives under the statute.

2. *Discussion.* The only question presented on appeal is whether the consultants were "representatives" of the taxpayer as that term was used in G. L. c. 64H, § 1,[8] as then applicable. The commissioner argues that the board's construction of "representative" was incorrect as matter of law. The taxpayer,

only and not through wholesale or retail stores or any other type of wholesale or retail sales operations. Consultant agrees that at any demonstration or sales meeting where Jafra products are offered for sale, only Jafra products will be offered for sale, and Consultant agrees not to demonstrate or offer for sale any other products at such demonstration. When presenting Consultant career opportunity, Consultant agrees to do so with sincerity and integrity."

[8]The parties' joint application for direct appellate review was limited to the proper construction of the statutory term "representative." Although the taxpayer originally contested the tax on constitutional grounds, the statutory question was the only issue briefed and argued before us.

on the other hand, contends that the board found, as matter of fact, that consultants solicited orders from Massachusetts residents for their own benefit and not for the benefit of the taxpayer, and that we must affirm the board's decision because it was supported by substantial evidence.

We review decisions by the board for errors of law, *Towle* v. *Commissioner of Revenue*, 397 Mass. 599, 601 (1986), and shall disturb the board's factual findings only if not supported by substantial evidence. G. L. c. 30A, § 14. However, "we are not required to affirm the board merely on a finding that the record contains evidence from which a rational mind might draw the desired inference. Our determination must be made 'upon consideration of the entire record.' " *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 466 (1981), quoting *Cohen* v. *Board of Registration in Pharmacy*, 350 Mass. 246, 253 (1966). See *Boston Edison Co.* v. *Selectmen of Concord*, 355 Mass. 79, 92 (1968). Because the board's determination that certain facts were legally significant flowed inevitably from its flawed construction of the statutory term, we are not limited to those facts found by the board to be dispositive. See *Commissioner of Revenue* v. *Wells Yachts South, Inc.*, 406 Mass. 661, 664-665 (1990). Cf. *New Boston Garden Corp.* v. *Assessors of Boston*, *supra.*

We have not previously construed the term "representative" as it is used in the statute. General Laws c. 64H, § 1, imposes sales and use tax liability on "vendors" "engaged in business in the commonwealth."[9] From 1967 to 1971, a vendor was "engaged in business" if it had "any representative, agent, salesman, canvasser or solicitor operating in the commonwealth for the purpose of selling, delivering or taking orders for tangible personal property." G. L. c. 64H, § 1 (5), inserted by St. 1967, c. 757, § 1. In 1971, the statute was amended such that, inter alia, the term "agent" was deleted.[10] St. 1971, c. 555, § 40. By using the terms "representative" and "agent" in the same section in the earliest version of the statute, the Legislature

[9]Although the board treated the matter as involving the imposition of sales tax alone, the commissioner had assessed the taxpayer for "sales and use" taxes and the taxpayer similarly sought an abatement of "sales and use" taxes. As the two taxes are intended to be complementary and the statutory basis for imposing each tax is virtually identical, we do not distinguish between them for purposes of this opinion. See G. L. c. 64H, § 1.

[10]See note 2, *supra.*

must have intended them to have different meanings. See *Flemings* v. *Contributory Retirement Appeal Bd.*, 431 Mass. 374, 376 (2000). In addition, if the Legislature intended to limit tax liability to those entities that had common-law agents located in the Commonwealth, then it would have been logical to amend § 1 (5) by omitting the term "representative" and leaving the term "agent," rather than amending it as it did. We view the 1971 amendment as evidencing a legislative intent favoring a more expansive, rather than a more restrictive, view of how business was conducted in the Commonwealth by out-of-State corporations.

The proposition that a representative is someone with less authority than an agent is found elsewhere in the statute. General Laws c. 64H, § 1 (9), provides that the commissioner may, for the efficient administration of the tax laws, deem a "representative" to be an "agent."[11] Reading the statute as a whole, *Bolster* v. *Commissioner of Corps. & Taxation*, 319 Mass. 81, 84-85 (1946), it follows that, if the commissioner is specifically authorized to treat a representative as if he or she were an agent, then a representative may be an individual who otherwise lacks an agency relationship with the vendor.

It remains for us to construe the term. Analogous cases arising under analogous, although not identical, statutes are instructive. In *Scripto, Inc.* v. *Carson*, 362 U.S. 207 (1960), the United States Supreme Court affirmed a decision of the Florida Supreme Court upholding imposition of a use tax on an out-of-State vendor. The vendor's sales force was comprised of approximately ten "jobbers" who, like the consultants, were independent contractors, not employees. The Florida Supreme Court held that these jobbers were "representatives" under a statute similar to the versions of G. L. c. 64H, § 1 (5), at issue here. *Scripto, Inc.* v. *Carson*, 105 So. 2d 775, 782 (Fla. 1958), aff'd, 362 U.S. 207 (1960). Jobbers were free to sell products for other manufacturers. Consultants were similarly free to sell products for other manufacturers although they were contractu-

---

[11] "'Retailer', includes . . . (iv) every salesman, representative, peddler or canvasser who, in the opinion of the commissioner, it is necessary to regard for the efficient administration of this chapter as the agent of the dealer, distributor, supervisor or employer under whom he operates of [*sic*] from whom he obtains the tangible personal property sold by him, in which case the commissioner may treat and regard such agent as the retailer jointly responsible with his principal, employer or supervisor for the collection and payment of the tax imposed by this chapter . . . ." G. L. c. 64H, § 1 (9).

ally prohibited from selling those other products at any demonstration or sales event at which Jafra products were sold or on display. Also, as was the case here, the Supreme Court noted that the minimal sanctions imposed on the jobbers from a failure to maintain "active" status fell short of termination.[12] Finally, like the agreement here, the contract in *Scripto* explicitly stated that jobbers "ha[d] no authority to make collections or incur debts involving [the taxpayer]." *Scripto, Inc.* v. *Carson*, 362 U.S. at 209.

Similarly, in *In re Newbern*, 286 Ala. 348, 352 (1970), appeal dismissed, 409 U.S. 813 (1972), the Alabama Supreme Court upheld the imposition of a use tax on an out-of-State vendor. There were approximately ninety individuals in the State soliciting orders from residents for the vendor's products on a commission basis. The Alabama Supreme Court eschewed legal formalism when it rejected the taxpayer's argument that the terms "agent" and "salesman" in that State's statute permitted imposition of the tax only if the individual soliciting the order had "some legal relationship with the out-of-State seller not articulated in the statute." *Id.* at 352. See *In re Scholastic Book Clubs, Inc.*, 260 Kan. 528 (1996) (teachers who collected orders for vendor "act[ed] as agents or representatives under the authority of [the vendor] even if there was no formal contract between the vendor and the teachers").

In construing the term "representative," we adopt the approach used by the Florida Supreme Court and approved by the United States Supreme Court in *Scripto* and examine whether the nature and extent of the out-of-State taxpayer's involvement with its in-State sales force was sufficient to support a conclusion that the sales force was made up of representatives for purposes of G. L. c. 64H, § 1. See *Scripto, Inc.* v. *Carson, supra* at 781. In so doing, we reject a technical construction of the term that would permit vendors to escape sales and use tax liability by artful drafting. "[W]e refuse to believe that so transparent an escape device from the sales tax was intended by the Legislature." *Clark Franklin Press Corp.* v. *State Tax Comm'n*, 364 Mass. 598, 603 (1974).

---

[12]Here, the board found that consultants suffered virtually no consequences for becoming inactive. According to the manager's guide, however, managers were entitled to receive sales bonuses only if they met the fifty-two class per year requirement, and only "active" managers were eligible for promotions. By comparison, jobbers who became inactive simply risked losing an automatic commission on repeat orders. *Scripto, Inc.* v. *Carson*, 362 U.S. 207, 209 (1960).

The evidence was uncontested that the consultants had no authority to bind the taxpayer. We accept the board's finding, based on substantial evidence, that they were under no contractual obligation to fulfil the taxpayer's expectations or to adhere rigidly to the taxpayer's suggestions for how best to succeed in the business of selling its products. However, we disagree with the board's conclusion that, absent a contractual obligation to sell, the motivation to sell was wholly personal and that therefore, as matter of law, sales made were on the consultants' own "behalf" and not "on behalf" of the taxpayer. Cf. *In re Scholastic Book Clubs, Inc., supra.*

The record as a whole reveals that the nature and extent of the taxpayer's involvement was such that the lack of contractual authority was legally insignificant. See *In re Newbern, supra* at 351 n.2 (existence or absence of " 'legal relationship' between seller and solicitor" was immaterial). Cf. *Scripto, Inc.* v. *Carson, supra* at 211 (employee or independent contractor "distinction is without constitutional significance"). The taxpayer structured its compensation opportunities so that adoption of the taxpayer's "ethics," "sharing," and " 'caring' concept" was the fastest route to financial success for the consultants. In addition, the taxpayer's financial future depended on the sales and recruiting efforts of its consultants: the taxpayer's employees did not solicit or accept orders; hence, just as a corporation cannot act except through its human representatives, absent the efforts of its hundreds of local consultants, the taxpayer would have had no Massachusetts "clients." The manager guide, produced and distributed by the taxpayer, makes this financial interdependence explicit by asserting that "[u]nlimited and enduring prosperity for all of us in Jafra is assured if we comply with [the] simple regulations [for maintaining manager status] which have been in effect since January 1, 1968."

Moreover, the fact that the consultants were not contractually obligated to sell does not change the fact that if consultants indeed sold the taxpayer's products: (1) the manner and places in which they could make those sales was contractually limited; (2) the claims consultants could make about the products were contractually defined; and (3) although consultants were not contractually bound to sell the products at the taxpayer's suggested retail prices, testimony at the hearing indicated that consultants did not deviate from the suggested retail prices. Adherence to the suggested retail prices was considered part of

the "Jafra Concept" that they were invited to understand and adopt. See *Scholastic Book Clubs, Inc.* v. *State Bd. of Equalization*, 207 Cal. App. 3d 734, 737 (1989) ("[O]nce [the teachers] undertake to act, they are obviously acting under [the taxpayer's] authority, and certainly as [the taxpayer's] agents or representatives").

Testimony at the hearing also established that the two guides admitted in evidence reflected the taxpayer's policies, including language that unambiguously demonstrated that the sales force of consultants was integral in the development and dissemination of those policies. For example, district directors were relied on for "advice on how best to establish and implement Company policies," and managers were issued a script to follow by which they might impart these policies to the consultants they sponsored.[13]

The fact that consultants were not required to adhere rigidly to the policies and suggestions in the guides is immaterial where, as here, the consultant who did follow the program became, in the taxpayer's own words, "a reflection of the company." The guide encouraged them to "[t]alk about your Company and how comfortable our program is" and to "[p]resent the Jafra Company to the best of your ability . . . [by being] well groomed, dressed properly, and wear[ing] natural looking make-up" because "[t]he more attractive [a consultant] is, the more elegant she is, the greater compliment she pays Jafra." The guide further assured consultants that "[n]o matter where you live, you will have a job with Jafra [because] Jafra has clients in all States including Alaska and Hawaii." The nature and extent of this out-of-State taxpayer's involvement with its in-State sales force is sufficient to establish that these independent sales people were "representatives" under G. L. c. 64H, § 1 (5). See *Scripto, Inc.* v. *Carson*, 105 So. 2d 775, 781 (Fla. 1958) ("[T]o the extent of the [limited contractual] authority granted to the Florida wholesale jobbers and the services which they render[ed] to [the taxpayer] . . . they [were] representative of [the taxpayer] for the purpose of attracting, soliciting and obtaining Florida customers for the [the taxpayer's] products"), aff'd, 362 U.S. 207 (1960).

---

[13]The script appeared in the manager guide with the advice that it be used by managers when issuing starter materials to newly recruited consultants. In it, managers urged the consultant to sell only at the suggested retail prices because it was "in their best interests" to do so.

The taxpayer argues that a finding for the commissioner amounts to applying the most recent version of the statute retroactively to its activities during the assessment period. The current version of the statute permits the commissioner to collect sales and use tax from vendors who "exploit[] the retail sales market in the commonwealth through any means whatsoever, including, but not limited to, salesmen, solicitors or representatives in the commonwealth." G. L. c. 64H, § 1 (5), as amended through St. 1988, c. 202, § 19. We disagree. While the amendment arguably expands the types of sales or marketing methods that may form the commissioner's statutory basis for imposing sales and use tax on a vendor, "representatives" have consistently been one avenue through which a vendor might effect those sales. Our decision is grounded on the determination that it was the taxpayer's elaborate involvement with its consultants that brought them within the reach of the statutory term, not the fact that the taxpayer "exploit[ed] the retail sales market in the commonwealth" through its consultants.

Finally, we note that the Legislature's broad grant of power to the commissioner is designed to promote the most efficient administration of the tax statutes. *Baker Transport, Inc.* v. *State Tax Comm'n*, 371 Mass. 872, 875 (1977). *Commissioner of Revenue* v. *Boback*, 12 Mass. App. Ct. 602, 604 (1981). Such a policy would be thwarted by a requirement that the commissioner track down hundreds of individuals in the Commonwealth who are contractually prohibited from selling products at wholesale and retail establishments. By contrast, imposing this burden on a vendor does not seem undue where the vendor knows the identity and sales volume of each sales person located in-State. See *Commissioner of Revenue* v. *J.C. Penney Co.*, 431 Mass. 684, 690 (2000) ("economic and commercial reality of the taxpayer's distribution of [its] catalogs" supported imposition of use tax). In fact, without conceding any tax liability, the taxpayer voluntarily collected the Massachusetts sales and use tax for sales made within the Commonwealth beginning in 1982 and had, since its inception, collected and remitted the California sales tax on the retail value of sales made in that State.

Because of our decision, we do not reach the parties' further dispute regarding the board's denial of the commissioner's motion to compel production of the names and addresses of all of

the consultants located in the State, information that the taxpayer has never, over the many years of these proceedings, provided.

3. *Conclusion.* The decision of the board is reversed.

*So ordered.*