NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11609

THE FIRST MARBLEHEAD CORPORATION & another[1] vs.  COMMISSIONER OF REVENUE.

Suffolk.     October 7, 2014. - January 28, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, & Hines, JJ.


Financial Institution.  Taxation, Excise, Apportionment of tax burden.  Constitutional Law, Taxation.  Notice, Tax taking.


Appeal from a decision of the Appellate Tax Board.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.


John S. Brown (Donald-Bruce Abrams with him) for the taxpayer.
Brett M. Goldberg (Daniel J. Hammond, Assistant Attorney General, with him) for Commissioner of Revenue.
Helen Hecht, Bruce Fort, Sheldon Laskin, & Lila Disque, of the District of Columbia, for Multistate Tax Commission, amicus curiae, submitted a brief.


BOTSFORD, J.  The taxpayers appeal from a decision of the

Appellate Tax Board (board) issued pursuant to G. L. c. 58A,

_____

[1] GATE Holdings, Inc. (Gate).

§ 7, and G. L. c. 62C, § 39 (c); their focus is on the financial institution excise tax (FIET) liability of the taxpayer GATE Holdings, Inc. (Gate), that was at all relevant times a wholly owned subsidiary of the taxpayer The First Marblehead Corporation (FMC).[2]  In its decision, the board accepted Gate's position that it qualified as a "financial institution" under G. L. c. 63, § 1, and was entitled to apportion its income pursuant to G. L. c. 63, § 2A (§ 2A).  The board, however, disagreed with Gate that in applying the apportionment rules of § 2A, all of Gate's taxable property, which consisted of securitized student loans, should be assigned to States outside the Commonwealth.  Rather, the board determined that all such property was properly assigned to Massachusetts, resulting in a greater FIET liability than Gate had calculated.  We affirm the board's decision.[3]

Facts.[4]  At issue here are the tax years ending June 30, 2004; June 30, 2005; and June 30, 2006 (tax years at issue). FMC was a publicly traded Delaware corporation with its

---

[2] The First Marblehead Corporation (FMC) sold Gate in 2009, which was after the tax years at issue in this proceeding.

[3] We acknowledge the amicus brief submitted by the Multistate Tax Commission (commission).

[4] The facts are taken from the board's decision, which was in turn based on the parties' statement of agreed facts and attached exhibits as well as witness testimony and other exhibits admitted during the hearing before the board.  The facts are not in dispute.

principal offices in Boston, and during the tax years at issue was the principal tax-reporting corporation for itself, Gate, and a number of other subsidiaries. FMC was involved in the growing industry facilitating private loans to students seeking to finance the cost of their postsecondary education. FMC did not make any loans directly to student borrowers, but rather brought together various parties involved in lending, including postsecondary schools, banks that issued loans to borrowers (originating banks), loan guarantors, loan servicing entities (servicers), and underwriters. In particular, FMC and its subsidiaries facilitated and coordinated the issuance and securitization of student loans through a complex process in which loans were purchased from originating banks with financing obtained via the issuance of asset-backed securities (ABS). The originating banks entered into agreements with FMC through which the banks issued loans to student borrowers and then sold portfolios of these loans to a number of different Delaware statutory trusts (trusts). To finance the purchases of loan portfolios, the trusts sold bonds, in the form of ABS, to underwriters that in turn sold the bonds to investors. Once the trusts acquired the loans, the loans became security for repayment of the bonds.

Loans require loan servicing, an umbrella term that includes accounting for accrued interest on the loans, billing,

receiving and processing payments, and working with borrowers in various stages of delinquency. Neither FMC nor any of its affiliates was directly involved in loan servicing but instead outsourced these activities to independent entities in that business (servicers). A large percentage of the loans securitized by FMC were serviced by the Pennsylvania Higher Education Assistance Agency (PHEAA), with a principal office in Harrisburg, Pennsylvania. A number of other servicers also serviced loans securitized by FMC, and, like PHEAA, were located outside Massachusetts. The servicers were the custodians of the loan records and all paper documents relating to the loans.

Gate played an integral role in the FMC student loan securitization process. Gate's purpose within this system was to hold residual beneficial interests in the trusts, either directly or through its own wholly owned subsidiary, National Collegiate Funding LLC. By the end of the tax years at issue, Gate held a beneficial interest in each of sixteen trusts that in turn held all of the student loans that had been securitized by FMC and its affiliates. These interests in the trusts constituted substantially all of Gate's assets. Income from the trusts, which consisted of interest on the student loans, passed through to Gate and comprised substantially all of Gate's gross income for these years.

Gate was essentially a holding company with no employees, payroll, tangible assets, or office space -- either owned or leased. Gate's tax returns indicated that its principal office was located at the same Boston address as FMC, and Gate's corporate books and tax returns also were maintained and prepared in Boston. Indeed, there is no dispute that Gate's commercial domicile was in Massachusetts during the tax years at issue. Like Gate, the trusts also had no assets other than the loan portfolios, cash, and other related assets, and they had no employees, payroll, or offices.

Procedural history. On September 15, 2006, FMC and Gate filed a voluntary disclosure request with the Commissioner of Revenue (commissioner) reporting their conclusion that Gate was a "financial institution," not a corporation as they had previously treated it for Massachusetts excise tax purposes, and their intent to change Gate's tax filing status accordingly. Gate then filed a Massachusetts financial institution excise return (Form 63FI) for each of the tax years at issue, and also sought an abatement of corporate taxes previously filed for the tax year ending on June 30, 2004. The commissioner denied the application for an abatement in July, 2007, and in September, 2007, FMC appealed to the board.

In December, 2009, following audits of the returns filed on behalf of FMC and Gate for the tax years at issue,[5] the commissioner further assessed FMC and Gate for additional taxes based on the commissioner's conclusion that Gate was taxable as a foreign corporation, or in the alternative, that Gate owed additional taxes as a financial institution.  FMC and Gate sought abatements of these assessments, which the commissioner denied in February and March, 2010, respectively.  Later in March, 2010, both FMC and Gate appealed these denials to the board.

The board heard the appeals and issued its findings of fact and report in April, 2013.  It concluded that Gate was a financial institution as defined in G. L. c. 63, § 1, due to the fact that Gate derived more than fifty per cent of its gross income from "lending activities" in substantial competition with other financial institutions.  The board further agreed with FMC and Gate that as a financial institution with loans held by student borrowers in all fifty States, Gate was entitled to apportion its income according to the rules established in § 2A, and that Gate properly had reported its "receipts factor" for

_____

[5] The audits of FMC's returns appear to have only been for the tax years ending June 30, 2005, and June 30, 2006.  However, the audits of Gate's returns appear also to have included the tax year ending June 30, 2004.

each of the tax years at issue as required under § 2A.[6]  However,

the board found that Gate's "property factor" was one hundred

per cent for each of the taxable years at issue, not zero as had

been reported on Gate's tax returns, with the result that for

each taxable year, fifty-one per cent of Gate's income was

taxable in Massachusetts.[7]  The combined outcome of the board's

conclusions was that FMC's taxes were abated in the amount of

$8,134,549, and Gate's taxes were abated in the amount of

$4,382,870.  While these amounts are substantial, Gate's

approved abatement was more than $4 million less than the amount

it originally had sought.[8]

---

[6] As discussed infra, tax apportionment for a financial institution is based on the average of the institution's receipts, payroll, and property factors.  G. L. c. 63, § 2A (b). The parties agree that because it had no employees, Gate had no payroll factor.  Accordingly, its tax apportionment formula is the average of its receipts and property factors.

[7] This percentage is derived by adding Gate's receipts factor -- determined to be two per cent -- and its property factor -- determined to be one hundred per cent -- and then dividing the total by two:  102%/2 = 51%.  See note 6, supra.

[8] Gate originally had sought a $1,205,002 abatement for the tax year ending in June, 2004, and $7,646,698 abatement for the tax years ending in June, 2005, and June, 2006, for a total of $8,851,700.

FMC and Gate timely appealed the board's decision to the Appeals Court.[9]  We transferred the case to this court on our own motion.

Standard of review.  "A decision by the board will not be modified or reversed if the decision 'is based on both substantial evidence and a correct application of the law.'" Capital One Bank v. Commissioner of Revenue, 453 Mass. 1, 8, cert. denied, 557 U.S. 919 (2009), quoting Boston Professional Hockey Ass'n v. Commissioner of Revenue, 443 Mass. 276, 285 (2005).  See Commissioner of Revenue v. Jafra Cosmetics, Inc., 433 Mass. 255, 259 (2001); Towle v. Commissioner of Revenue, 397 Mass. 599, 601-602 (1986).  "Because the board is authorized to interpret and administer the tax statutes, its decisions are entitled to deference. . . .  Ultimately, however, the interpretation of a statute is a matter for the courts" (citation omitted).  Onex Communications Corp. v. Commissioner of Revenue, 457 Mass. 419, 424 (2010).  Finally, in circumstances where a taxpayer seeks an abatement of a tax, "[t]he taxpayer has the burden of proving as a matter of law [its] right to an abatement" (citation omitted).  Boston Professional Hockey Ass'n, supra at 285.  This burden has been

_____

[9] Although both FMC and Gate appealed, the appeal solely concerns Gate's tax liability.  The taxpayers have filed one brief and present a joint argument.  For ease of reference, we refer only to Gate as the appealing party in the remainder of this opinion.

found to be particularly heavy in the context of taxpayer challenges to an apportionment formula, because "the taxpayer must prove by 'clear and cogent evidence' that the income attributed to the Commonwealth is in fact 'out of all appropriate proportion to the business transacted' here or has 'led to a grossly distorted result.'"  See id., quoting Gillette Co. v. Commissioner of Revenue, 425 Mass. 670, 679 (1997) (discussing challenges to corporate tax apportionment under G. L. c. 63, § 38).  See also Container Corp. of Am. v. Franchise Tax Bd., 463 U.S. 159, 170 (1983).

Discussion.  Section 2A was enacted in 1995,[10] an important component of legislation that appears to have been intended to reduce the tax burden on Massachusetts banks by lowering the bank excise tax rate and by permitting financial institutions that derive income from business activities conducted both inside and outside the Commonwealth to apportion their income, thereby avoiding double taxation and reducing incentives for these businesses to move their operations out of State.[11]  See

---

[10] See G. L. c. 63, § 2A (§ 2A), inserted by St. 1995, c. 81, § 1.

[11] For purposes of G. L. c. 63, §§ 2 and 2A, the term "financial institution" encompasses banks, banking associations, trust companies, and Federal and State savings and loan associations, as well as other types of businesses, including any that "in substantial competition with financial institutions derive[] more than [fifty] per cent of [their] gross income . . . from loan origination, from lending activities, including

Memorandum from Deputy Chief Legal Counsel Lon F. Povich to Governor William F. Weld and Lieutenant Governor Paul Cellucci (July 26, 1995) (Povich memorandum) (regarding House Bill No. 4975, "An Act relative to the equitable taxation of financial institutions").  See also Memorandum from Barbara Kessner Landau, Assistant General Counsel, Executive Office of Economic Affairs, to Governor's Legal Office (July 26, 1995) (same).

Section 2A sets out income apportionment rules that define how "[t]he commissioner shall determine the part of the net income of a financial institution derived from business carried on within the commonwealth."  See G. L. c. 63, § 2A (b)-(g).  These rules incorporate a formula crafted by the Multistate Tax Commission (commission),[12] see Povich memorandum, supra, and

_____

discounting obligations, or from credit card activities."  G. L. c. 63, § 1.

[12] The commission was created by the Multistate Tax Compact (compact) and serves to promote the compact's goals, including "[p]romot[ing] uniformity or compatibility" among State tax systems and "[a]void[ing] duplicative taxation."  See The Multistate Tax Compact:  Suggested Legislation and Enabling Act, art. I, at 1 (effective Aug. 4, 1967), available at http://www.mtc.gov/uploadedFiles/Multistate_Tax_Commission/About_MTC/MTC_Compact/COMPACT(1).pdf [http://perma.cc/3S85-TQR4] (last visited Jan. 26, 2015.  The compact is a model law that "deals primarily with taxes which affect businesses that operate in more than one state."  Id. at preamble.  Massachusetts is currently an "Associate member" of the commission, which implies participation in commission meetings and projects and consultation and cooperation with the commission and its members.  Multistate Tax Commission, Member States, at http://www.mtc.gov/The-Commission/ Member-States [http://perma.cc/DE33-UEZ5] (last visited Jan. 26, 2015).

apply only to financial institutions that are taxable in both the Commonwealth and in other States. They allocate income to the Commonwealth for tax purposes by multiplying the taxpayer's income by the "apportionment percentage" that is "determined by adding the taxpayer's receipts factor, property factor and payroll factor together and dividing the sum by three."[13] G. L. c. 63, § 2A (b). Each of these listed factors is a fraction, the numerator of which reflects the taxpayer's receipts, property, or payroll located within the Commonwealth for the taxable year in question, and the denominator of which reflects the taxpayer's receipts, property, or payroll both within and without the Commonwealth. See G. L. c. 63, §§ 2A (d)-(f). In this way, the apportionment formula attempts to "approximate the net income derived from business carried on within the commonwealth." See G. L. c. 63, § 2A (g). See also Final Report of Hearing Officer Regarding Proposed Multistate Tax Commission Formula for the Uniform Apportionment of Net Income from Financial Institutions 20, 21 (Apr. 28, 1994) available at http://www.mtc.gov/uploadedFiles/Multistate_Tax_Commission/Unifo rmity/Uniformity_Projects/A_-_Z/Final%20HO%20Rpt%20FinInst.pdf

---

[13] In other words, the "apportionment percentage" is the average of the taxpayer's "receipts factor," "property factor," and "payroll factor." As mentioned, in Gate's case, the apportionment percentage is the average of Gate's receipts and property factors. See note 6, supra.

[http://perma.cc/99CH-XSDX] (last visited Jan. 26, 2015) (Final Report) (apportionment formula is designed to "fairly represent the taxpayer's business activities in the state," i.e., to approximate the "income-producing activities of the taxpayer in the state").

In this appeal, no party challenges the board's ruling that Gate qualified as a "financial institution," was taxable in both the Commonwealth and in other States, and was thus entitled to apportion its income according to the rules in § 2A. There is also no challenge to Gate's determination, approved by the board, of its receipts factor for each of the years in question,[14] as well as Gate's position that it had no payroll factor. The only issue presented is how Gate's property factor is to be calculated. Specifically, we must determine whether the loan portfolios that represented substantially all of Gate's property for the tax years at issue should be treated as having been located in whole or in part within the Commonwealth, and

---

[14] With respect to Gate's receipts factor, the board, applying the rules set out in § 2A (d), determined that "substantially all of Gate's income was interest from the [l]oan [p]ortfolios that was passed through to Gate from the [t]rusts," and that this income "comprised the whole of Gate's receipts factor and was included in its numerator or [only its] denominator [of the receipts factor fraction] based on the location of the borrowers." Because "Gate's share of the interest from borrowers located in Massachusetts represented approximately two percent of Gate's total receipts," the board found that Gate's receipts factor had been properly reported on Gate's returns.

thus included in the numerator of Gate's property factor fraction, or outside the Commonwealth, and therefore excluded from the numerator and included only in the denominator of the fraction. The answer to this question has a significant impact on Gate's total tax liability for the relevant years: if all of Gate's loans are treated as having been located within the Commonwealth, as the board found, then Gate's property factor was one hundred per cent. If, however, as FMC and Gate claim, all of the loans were located outside the Commonwealth, then for purposes of § 2A, Gate's property factor would be zero.[15]

The rules for determining a taxpayer's property factor are contained in § 2A (e), and property consisting of loans is the focus of § 2A (e) (vi). This section provides in relevant part:

"(vi) (A) (1) A loan is considered to be located within the commonwealth if it is properly assigned to a regular place of business of the taxpayer within the commonwealth.

"(2) A loan is properly assigned to the regular place of business with which it has a preponderance of substantive contacts. . . .

"(B) In the case of a loan which is assigned by the taxpayer to a place without the commonwealth which is not a regular place of business, it shall be presumed, subject to rebuttal by the taxpayer on a showing supported by the preponderance of evidence, that the preponderance of substantive contacts regarding the loan occurred within the commonwealth if, at the time the loan was made the

---

[15] This is so because if all of the loans are deemed located outside the Commonwealth, the numerator of Gates's property factor fraction is zero, and therefore the entire fraction is zero.

taxpayer's commercial domicile, as defined in [G. L. c. 63, § 1], was within the commonwealth.

"(C) To determine the state in which the preponderance of substantive contacts relating to a loan have occurred, the facts and circumstances regarding the loan at issue shall be reviewed on a case-by-case basis and consideration shall be given to such activities as the solicitation, investigation, negotiation, approval and administration of the loan."[16]

General Laws c. 63, § 1, defines "regular place of business" as "an office at which the taxpayer carries on its business in a regular and systematic manner and which is consistently maintained, occupied and used by employees of the taxpayer."  The parties agree that Gate, which had no offices or employees, had no "regular place of business" either within or outside the Commonwealth.  Thus, the loans could not have been assigned under § 2A (e) (vi) (A) to a regular place of business belonging to Gate.  However, Gate argued before the board and continues to argue, essentially, that under § 2A (e) (vi) (B) and (C), the loans can and should be assigned to the locations of the servicers, because those locations were where the "preponderance of substantive contacts" relating to the loans

---

[16] The terms "solicitation," "investigation," "negotiation," "approval," and "administration" are defined in § 2A (e) (vi) (C) (1)-(5).  The definitions are quoted and discussed infra.

occurred.  As next discussed, the board rejected this argument, as do we.[17]

1.  <u>Presumption of commercial domicile</u>.  First, the board concluded that § 2A (<u>e</u>) (vi) (B) creates a rebuttable presumption that where a taxpayer seeks to assign loans to a location that is <u>not</u> a regular place of business of that taxpayer, the loans should be assigned to its commercial domicile.  We agree.  We view the language of § 2A (<u>e</u>) (vi) (B)[18] to be unambiguous in establishing the rebuttable default presumption described by the board.  See <u>Commissioner of Revenue</u> v. <u>Cargill, Inc</u>., 429 Mass. 79, 82 (1999) (court follows

---

[17] Before the board, the Commissioner of Revenue (commissioner) argued primarily that Gate was not engaged in lending activities, and that therefore it should have been characterized for taxation purposes as a "foreign corporation" rather than as a "financial institution."  At this point, however, the commissioner has accepted the board's determination that Gate was a "financial institution," and urges that we adopt the board's interpretation of § 2A (<u>e</u>).

[18] The establishment in § 2A (<u>e</u>) (vi) (B) of the taxpayer's commercial domicile as the default location of a loan is consistent with the reference to commercial domicile as a default resolution for other apportionment issues addressed in § 2A.  For example, in the context of the receipts factor analysis, § 2A (<u>d</u>) (xiii) provides that "[a]ll receipts which would be assigned under this section to a state in which the taxpayer is not taxable shall be included in the numerator of the receipts factor, if the taxpayer's commercial domicile is in the commonwealth."  Section 2A (<u>a</u>), as amended by St. 2004, c. 262, § 35, also provides that any portion of the net income of a financial institution that cannot be taxed to another State under the United States Constitution will be allocated to the Commonwealth if the commercial domicile of the institution is in the Commonwealth.

language of statute "when its language is plain and unambiguous, and its application would not lead to an absurd result, or contravene the Legislature's clear intent" [quotations and citation omitted]).

Gate notes the presence of the words "at the time the loan was made" in § 2A (e) (vi) (B),[19] and contends that this means the presumption of commercial domicile applies only in the context of an original lender, and that the presumption exists specifically to prevent such a taxpayer from "artificially assigning" a loan that originated at the taxpayer's actual place of business to another State where it has no place of business.

Reading the language of this provision as narrowly as Gate proposes, however, renders the statute unworkable for a taxpayer like Gate. This is because § 2A (e) (vi) contemplates only two assignment alternatives for a taxpayer's loans: the loans will be assigned to a regular place of business of the taxpayer, either within or outside the Commonwealth -- the alternative described in § 2A (e) (vi) (A) (1) and (2); or the loan will be assigned outside the Commonwealth to a place that is not a

_____

[19] For ease of reference, we quote again the relevant portion of § 2A (e) (vi) (B): "In the case of a loan which is assigned by the taxpayer to a place without the commonwealth which is not a regular place of business, it shall be presumed, subject to rebuttal by the taxpayer . . . that the preponderance of substantive contacts regarding the loan occurred within the commonwealth if, at the time the loan was made the taxpayer's commercial domicile . . . was within the commonwealth" (emphasis added).

regular place of business of the taxpayer -- the alternative described in § 2A (e) (vi) (B). If the § 2A (e) (vi) (B) alternative were to apply only to taxpayers who are original lenders, the statute would provide no guidance when the taxpayer, like Gate, is not an original lender but has no regular place of business. Such a reading would leave open the possibility that loans qualifying as property of the taxpayer could exist without being assigned anywhere. This is clearly an unintended and ultimately absurd result. A more reasonable interpretation is that the phrase "at the time the loan was made" is present in § 2A (e) (vi) (B) to resolve any ambiguity in the case of a taxpayer whose commercial domicile may have changed from within to outside the Commonwealth during the life of the loan. No such ambiguity exists here. Accordingly, the board properly ruled that the presumption in § 2A (e) (vi) (B) applied to Gate without regard to the sites of origination of the loans in question.

2. Preponderance of substantive contacts of Gate's loans. Under § 2A (e) (vi), to determine the proper assignment of a loan for apportionment purposes, it is necessary to determine whether "the preponderance of substantive contacts regarding the loan" was within or outside the Commonwealth. Because Gate's commercial domicile was in the Commonwealth, application of the § 2A (e) (vi) (B) presumption to Gate means that "the

preponderance of substantive contacts regarding the loan occurred within the commonwealth" for purposes of calculating Gate's property factor, unless the presumption was rebutted. And § 2A (e) (vi) (B) places the burden of rebuttal squarely on Gate as the taxpayer.

In seeking to rebut the presumption, Gate points to § 2A (e) (vi) (C), quoted supra, and specifically its language indicating that the "preponderance of substantive contacts of a loan" must be determined on a "case-by-case basis." The section goes on to say that the required determination is to include consideration of activities such as the "solicitation," "investigation," "negotiation," "approval," and "administration" of the loan. G. L. c. 63, § 2A (e) (vi) (C) (1)-(5).[20,21] The

---

[20] The terms "solicitation," "investigation," "negotiation," "approval," and "administration" are defined in § 2A (e) (vi) (C) as follows:

"(1) 'Solicitation' is either active or passive. Active solicitation occurs when an employee of the taxpayer initiates the contact with the customer. Such activity is located at the regular place of business which the taxpayer's employee is regularly connected with or working out of, regardless of where the services of such employee were actually performed. Passive solicitation occurs when the customer initiates contact with the taxpayer. If the customer's initial contact was not at a regular place of business of the taxpayer, the regular place of business, if any, where the passive solicitation occurred is determined by the facts in each case.

"(2) 'Investigation' is the procedure whereby employees of the taxpayer determine credit-worthiness of the customer as well as the degree of risk involved in

board stated, and Gate agrees, that of these five listed activities, only "administration" could possibly apply to Gate's loans because all the other factors listed relate to the origination of loans and Gate played no role in loan origination.  The statute defines "administration" as "the

---

making a particular agreement.  Such activity is located at the <u>regular place of business</u> which the taxpayer's employees are regularly connected with or working out of, regardless of where the services of such employees were actually performed.

"(3) 'Negotiation' is the procedure whereby employees of the taxpayer and its customer determine the terms of the agreement such as the amount, duration, interest rate, frequency of repayment, currency denomination and security required.  Such activity is located at the <u>regular place of business</u> which the taxpayer's employees are regularly connected with or working out of, regardless of where the services of such employees were actually performed.

"(4) 'Approval' is the procedure whereby employees or the board of directors of the taxpayer make the final determination whether to enter into the agreement.  Such activity is located at the <u>regular place of business</u> which the taxpayer's employees are regularly connected with or working out of, regardless of where the services of such employees were actually performed.  If the board of directors makes the final determination, such activity is located at the commercial domicile of the taxpayer.

"(5) 'Administration' is the process of managing the account.  This process includes bookkeeping, collecting the payments, corresponding with the customer, reporting to management regarding the status of the agreement and proceeding against the borrower or the security interest if the borrower is in default.  Such activity is located at the <u>regular place of business</u> which oversees this activity."  (Emphases added.)

[21] These terms are collectively referred to as the "SINAA" factors.  Final Report, <u>supra</u> at 48.

process of managing the account," § 2A (e) (vi) (C) (5), including bookkeeping, payment collection, customer correspondence, and addressing situations of default -- which are essentially the activities performed by the loan servicers in the FMC securitization system.

The board rejected Gate's claim that because the servicers "administer" the loans owned by the trusts (and therefore Gate), the servicers' loan administration activities -- all performed in States other than Massachusetts -- were attributable to Gate. The board reasoned that, as a factual matter, Gate had not proved the servicers were agents of the trusts (or derivatively Gate), and that Gate had not offered any other legal basis for attributing the activities of the servicers to Gate. Accordingly, the board disregarded the activities of the servicers in determining whether Gate had any "substantive contacts" with the loans outside the Commonwealth, and finding none, applied the presumption of commercial domicile in § 2A (e) (vi) (B) to all the loans in question.

Gate challenges the board's determination. It asserts that the board unilaterally, and improperly, inserted the concept of agency into the analysis of § 2A (e) (vi) (B), and that even if agency is the appropriate test, the loan documents make clear that the servicers in fact were agents of the trusts and therefore of Gate as the holder of a beneficial interest in each

of the trusts.  We conclude, however, that an analysis whether the servicers were agents of Gate, and if so, what type of agents they were, is unnecessary in order to locate the "preponderance of substantive contacts" of the loans.  This is because none of the types of "activities" regarding a loan that § 2A (e) (vi) (C) (1)-(5) describes -- the SINAA factors (see note 21, supra) -- reasonably can be understood to encompass the activities of an entity other than the taxpayer.

We begin with "administration."  After identifying the types of actions that collectively comprise the "activity" of loan administration, § 2A (e) (vi) (C) (5) states expressly that "[s]uch activity is located at the regular place of business which oversees this activity."  As previously discussed, "regular place of business" is defined specifically in the statute as "an office at which the taxpayer carries on its business in a regular and systematic manner and which is consistently maintained, occupied and used by employees of the taxpayer" (emphases added).  G. L. c. 63, § 1.  Thus, the language of § 2A (e) (vi) (C) (5) appears to contemplate that when loan administration is used to determine the "preponderance of substantive contacts" of a taxpayer's loan or loans, only the loan administration activities of the taxpayer are taken into consideration; work performed by agents or independent contractors of the taxpayer, at least where the agents or

contractors are separate businesses with their own places of business and their own staff, do not fit within the equation.[22] Accordingly, it is irrelevant whether the servicers were or were not agents of Gate, because in either case, their actions were not appropriately included within the concept of administration as defined in § 2A (e) (vi) (C) (5).[23]

It is true that this reading of loan administration as requiring activity at the regular place of business of the taxpayer leads to the conclusion that the loans appear to have had no "substantive contacts" as that concept is described in § 2A (e) (vi) (C) (1)-(5). But § 2A contains within it a straightforward solution to this problem, which is application of the presumption of commercial domicile as specified in § 2A (e) (vi) (B).

---

[22] The principal loan servicer, the Pennsylvania Higher Education Assistance Agency, for example, is a governmental agency of the Commonwealth of Pennsylvania.

[23] We agree with the board and Gate that the other four types of activities listed in § 2A (e) (vi) (C) -- solicitation, investigation, negotiation, and approval, see § 2A (e) (vi) (C) (1)-(4) -- do not apply to Gate because they all concern loan origination, an activity in which Gate was not involved. Nevertheless, each of these subsections indicates that the activity described is located at "the regular place of business" which the taxpayer's employee is "regularly connected with or working out of," or, in the case of some loan approvals, at the "commercial domicile of the taxpayer." Id. Thus, like administration, each of these activities focuses on a regular place of business or commercial domicile of the taxpayer itself.

Nor does our reading of § 2A create an absurd result when viewing the statute as a whole. The statute expressly recognizes that its provisions regarding the receipts, property, and payroll factors may not reasonably fit the nature of all financial institutions' business models, and it has a separate provision to accommodate this circumstance. Specifically, § 2A (g) provides that "[i]f the provisions of subsections (a) to (f), inclusive, are not reasonably adapted to approximate the net income derived from business carried on within the commonwealth, a financial institution may apply to the commissioner, or the commissioner may require the financial institution, to have its income derived from business carried on within this commonwealth determined by a method other than that set forth in subsections (a) to (f), inclusive." Here, although the board found that Gate qualified for taxation purposes as a financial institution, Gate is unlike many if not most financial institutions contemplated in the statute, in that Gate's narrow role within FMC's loan securitization business is very different from traditional concepts of banking.[24] Given this fact,

---

[24] As noted supra, the term "financial institution" encompasses first and foremost banks, banking associations, trust companies, and Federal and State savings and loan associations. G. L. c. 63, § 1. Other businesses subject to Federal or State banking and related laws are also incorporated. Id. Thus, although the statute is constructed in such a way as to include other types of businesses, including those that "[derive] more than 50 per cent of [their] gross income . . .

application of an alternative apportionment approach as permitted under § 2A (g) may well have offered a reasonable option in this case, avoiding what might appear as an exercise of fitting a square peg into a round hole. In fact, the record indicates that the commissioner raised the idea of applying an alternative approach under § 2A (g) to determine the proper apportionment of Gate's income, albeit using an approach that resulted in all or substantially all of Gate's income being apportioned to Massachusetts. Ultimately, however, Gate rejected the proposal to apply § 2A (g), asserting instead -- incorrectly, we conclude -- that the FIET was specifically designed for taxpayers such as Gate. In these circumstances, Gate's complaints regarding what may seem like an awkward result arising from application of the provisions of § 2A (e) (vi) to the loans in this case ring somewhat hollow.

As has been discussed, the rules set out in § 2A seek to produce a reasonable approximation of a financial institution's net income related to the business it carries on in the Commonwealth. Gate's business was to assist in the FMC securitization program through participating in the formation of the trusts and holding residual beneficial interests in those

---

from lending activities," id. -- the basis of the board's determination that Gate qualified as a financial institution -- many if not most of the businesses that fall within the statute's definition are banks or closely related to banks.

trusts. It was a holding company, with no employees of its own. Gate appears to have had no direct relationship with the loan servicers, whose actual contracts were with FMC, and thus no ability to control the work that they did in servicing the student loans. In these circumstances, it is appropriate that the servicers' activities in administering the student loans not be attributed to Gate for the purpose of determining the "preponderance of substantive contacts" regarding the loans under § 2A (e) (vi) (C).

In sum, we agree with the board that the presumption established in § 2A (e) (vi) (B) has not been rebutted, and all of the loans were properly located at Gate's commercial domicile in Massachusetts.

3. Constitutional considerations. In support of its argument that the servicers' loan administration activities should have been attributed to Gate, Gate invokes decisions of the United States Supreme Court and this court concerning constitutional standards for attributing activities of a taxpayer's representative to the taxpayer for taxation-related purposes. While the Supreme Court and this court have identified constitutional issues bearing upon tax apportionment (as we discuss below), all of the cases that Gate cites relate to a State's capacity to assert jurisdiction over an out-of-State taxpayer for purposes of imposing a tax. See Scripto,

Inc. v. Carson, 362 U.S. 207, 208 (1960) (considering whether out-of-State taxpayer had "sufficient jurisdictional contacts" with Florida to justify imposition of Florida tax). See also Tyler Pipe Indus., Inc. v. Washington State Dep't of Revenue, 483 U.S. 232, 249, 251 (1987) (activities of taxpayer's in-State representatives adequately supported Washington's jurisdiction to tax out-of-State taxpayer);[25] Commissioner of Revenue v. Jafra Cosmetics, Inc., 433 Mass. at 255-256, 261-263 (in-State activities of sales representatives justified sales and use taxation of out-of-State taxpayer). The issue of State jurisdiction to tax in this case is different. The jurisdictional question here is whether any State besides the Commonwealth could theoretically impose a tax on Gate. It is a threshold question that relates only to whether Gate was allowed to apportion its income in accordance with the formula laid out in § 2A; if a "financial institution" like Gate does not have income that is taxable in another State, all of its income is taxable in the Commonwealth. See G. L. c. 63, § 2A (a). As noted earlier, the board found that Gate was taxable in all fifty States, and thus was entitled to apportion its income. Neither party has appealed this issue.

---

[25] Tyler Pipe Indus., Inc. v. Washington State Dep't of Revenue, 483 U.S. 232, 251 (1987), also raised an issue of apportionment, but that was not the basis for which Gate cited it.

With respect to apportionment, both the United States Supreme Court and this court have found that the due process clause and the commerce clause require fairness in apportioning the income of a business that may be taxed in multiple States. See Container Corp. of Am. v. Franchise Tax Bd., 463 U.S. at 169; Exxon Corp. v. Department of Revenue, 447 U.S. 207, 219, 227-228 (1980); Gillette Co. v. Commissioner of Revenue, 425 Mass. at 680. While the Federal Constitution "imposes no single [apportionment] formula on the States," apportionment must produce at least a "'rough approximation' of the corporate income that is 'reasonably related to the activities conducted within the taxing State.'" Gillette Co., supra at 680-681, quoting Exxon Corp., supra at 223. However, if a taxpayer seeks to challenge the appropriateness of an apportionment formula on this basis, it is incumbent upon the taxpayer to show by "'clear and cogent evidence' that the income attributed to the State is in fact 'out of all appropriate proportions to the business transacted . . . in that State.'" Container Corp. of Am., supra at 170, quoting Hans Rees' Sons v. North Carolina ex rel. Maxwell, 283 U.S. 123, 135 (1931). See Boston Professional Hockey Ass'n, 443 Mass. at 285; Gillette Co., supra at 679-680.

Two elements of fairness arising under the due process clause have been identified in this context and relate to the present case. "The first . . . component of fairness in an

apportionment formula is what might be called internal consistency -- that is, the formula must be such that, if applied by every jurisdiction, it would result in no more than all of the unitary business'[s] income being taxed.  The second and more difficult requirement is what might be called external consistency -- the factor or factors used in the apportionment formula must actually reflect a reasonable sense of how income is generated."  Gillette Co., 425 Mass. at 680, quoting Container Corp. of Am., 463 U.S. at 169.[26]

Considering the first factor, we have no reason to conclude that application of the apportionment statute as we have interpreted it produces duplicative taxation of Gate's income, given that Gate's Massachusetts apportionment percentage for the tax year at issue was approximately fifty-one per cent, and the record reflects that Gate filed tax returns only in Massachusetts and Florida for the relevant years.[27]

---

[26] A third element of fairness, that "an apportionment formula must . . . not result in discrimination against interstate or foreign commerce," has been identified under the commerce clause. Gillette Co. v. Commissioner of Revenue, 425 Mass. 670, 682 (1997), quoting Container Corp. of Am. v. Franchise Tax Bd., 463 U.S. 159, 170 (1983). However, "[i]n the interstate context, the antidiscrimination principle has not in practice required much in addition to the due process fairness requirement." Id. at 682-683. Moreover, Gate has advanced no argument that the board's interpretation of the apportionment statute here discriminates against interstate commerce.

[27] Based on Gate's Florida tax returns, it appears that Gate's apportionment percentage in Florida was less than five per cent for each of the tax years at issue.

With respect to the second factor -- whether the apportionment scheme reasonably reflects how a business generates income -- as previously mentioned, the underlying economic activity giving rise to Gate's income was FMC's loan securitization program. As the board's findings reflect, the purpose of Gate's existence was to hold interests in trusts containing loans as part of FMC's securitization process. Furthermore, because Gate had no offices or employees of its own, and because it was a wholly owned subsidiary of FMC, it makes more sense to view the income-producing activity of Gate as connected to FMC, its parent company, rather than as connected to the servicers, which were independent and unrelated entities. Viewed this way, we think an outcome that locates all of the loans at Gate's and FMC's commercial domicile, rather than at the place of business of the servicers, results in the most appropriate approximation of how Gate generated income.[28]

Gate argues that it was unreasonable to allow Gate's property factor to increase its over-all apportionment percentage from approximately two per cent to more than fifty per cent, given that the loans did not appear to have any "substantive contacts" with Massachusetts in the sense described by the SINAA factors. In addition, they argue that Department

---

[28] The commission, as amicus curiae, advances a similar analysis.

of Revenue Letter Ruling 87-9 (Sept. 18, 1987) permitted a trust consisting of thousands of loans, only a small percentage of which had connections to Massachusetts, to apportion its income based solely on the percentage of income received from interest on the Massachusetts loans, and that Gate should be entitled to do the same.  We disagree.  The first point assumes a particular interpretation of § 2A (e) (vi) -- specifically that loans must have some "substantive contacts" of the kind described in § 2A (e) (vi) (C) -- that we have concluded is incorrect for the reasons previously discussed.  The analogy to the trust described in Letter Ruling 87-9 is also unpersuasive, because the income of that trust was to be apportioned using the formula that applied to corporations, which involved three factors (property, payroll, and sales), of which the trust claimed to have none.  Letter Ruling 87-9.  Thus, the trust proposed a unique method of apportionment that would apply only to the "special circumstances" of that case.  Id.  Again, as noted above, FMC and Gate have not requested alternative apportionment under § 2A (g), and instead have argued that the general apportionment formula under § 2A (b) applies.

In short, Gate has not met its burden to show that apportionment as applied in this case was unfair or unreasonable; we discern no violation of the due process or commerce clause as a result of the decision we reach here.

4. Notice. Finally, Gate argues that the board improperly resolved this case in favor of the commissioner based on a legal theory that the commissioner did not raise before the board, specifically, that an agency relationship was required between Gate and the servicers in order to attribute the servicers' activities to Gate. Gate claims that this action by the board violates G. L. c. 58A, § 7, which states in pertinent part: "the board shall not consider, unless equity and good conscience so require, any issue of fact or contention of law not specifically set out in the petition upon appeal or raised in the answer."

In this case, it was Gate that put forward the theory that Gate had "substantive contacts" with the loans through the activities of the servicers. While Gate clearly did not argue that an agency relationship was required in order to attribute the servicers' activities to Gate, the board was within its authority to consider Gate's argument concerning the servicers and to determine whether it fit within an appropriate interpretation of § 2A (e) (vi). The quoted limitation in G. L. c. 58A, § 7, has been interpreted to prohibit more surprising or unexpected legal turnabouts, such that one party could not have been expected to adequately advance their position under the circumstances. See, e.g., Deveau v. Commissioner of Revenue, 51 Mass. App. Ct. 420, 420-421, 426-428 (2001) (board decided

taxpayers' appeals based on new theory first advanced by commissioner on morning of hearing; court suggested, without needing to decide, that this approach would violate G. L. c. 58A, § 7). We conclude that Gate had sufficient notice of the basis of the board's decision pursuant to G. L. c. 58A, § 7.

Decision of the Appellate Tax
Board affirmed.
