NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11609

THE FIRST MARBLEHEAD CORPORATION & another[1]  vs. COMMISSIONER OF REVENUE.


Suffolk.     May 3, 2016. - August 12, 2016.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, & Hines, JJ.[2]


Financial Institution.  Taxation, Excise, Apportionment of tax burden.  Constitutional Law, Taxation, Commerce clause, Interstate commerce.  Interstate Commerce.


Appeal from a decision of the Appellate Tax Board.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

Donald-Bruce Abrams (John S. Brown with him) for the taxpayer.
Brett M. Goldberg, Assistant Attorney General (Daniel J. Hammond, Assistant Attorney General, with him) for Commissioner of Revenue.
The following submitted briefs for amici curiae:
Margaret Winterkorn Meyers, of New York, David W.T. Daniels, of the District of Columbia, & Emily M. Kelley, for Michael S. Knoll & another.

---

[1] GATE Holdings, Inc. (Gate).

[2] Justice Duffly participated in the deliberation on this case prior to her retirement.

Helen Hecht, Bruce Fort, Sheldon Laskin, & Lila Disque, of the District of Columbia, for Multistate Tax Commission.

BOTSFORD, J.  In The First Marblehead Corp. v. Commissioner of Revenue, 470 Mass. 497, 498 (2015) (First Marblehead), this court affirmed a decision of the Appellate Tax Board (board) concerning the tax liability of the taxpayer GATE Holdings Inc. (Gate), under the Commonwealth's financial institution excise tax (FIET).  Gate was a wholly owned subsidiary of The First Marblehead Corporation (FMC),[3] id. at 497-498, and "played an integral role in the FMC student loan securitization process[,]" as the holder of beneficial interests in all the separate trusts that effectively owned the securitized student loans.  Id. at 499.  Gate had no employees, no office space, and no tangible assets; it was essentially a holding company.  Id.  Gate's taxable property consisted of its interests in the securitized student loans held in the trusts.  Id.  In its decision, the board determined, and this court agreed, that all of Gate's interests in the securitized loans were properly assigned to Massachusetts under the FIET's apportionment rules set forth in G. L. c. 63, § 2A, resulting in a greater tax liability than Gate had calculated.  Id. at 498.

---

[3] Gate and The First Marblehead Corporation are referred to collectively as Gate in this opinion.

Gate filed a petition for a writ of certiorari in the United States Supreme Court.  On October 13, 2015, the Court granted Gate's petition, vacated this court's rescript in the case, and remanded the case for further consideration in light of Comptroller of the Treasury of Md. v. Wynne, 135 S. Ct. 1787 (2015) (Wynne), decided approximately four months after First Marblehead.  See The First Marblehead Corp. v. Massachusetts Comm'r of Revenue, 136 S. Ct. 317 (2015).  In accordance with the Court's directive, and with the benefit of additional briefing and argument by the parties, we have further considered this case.  We again affirm the decision of the board.

Wynne, 135 S. Ct. at 1793, concerned a challenge to Maryland's personal income tax scheme under the dormant commerce clause of the United States Constitution.  See art. I, § 8, cl. 3, of the United States Constitution.  The Court's decision reaffirmed the "internal consistency test" articulated in Container Corp. of Am. v. Franchise Tax Bd., 463 U.S. 159, 169 (1983), and Oklahoma Tax Comm'n v. Jefferson Lines, Inc., 514 U.S. 175, 185 (1995) (Jefferson Lines), for determining whether a tax violates the dormant commerce clause.  The Court described the test as follows:  "This test, which helps courts identify tax schemes that discriminate against interstate commerce, 'looks to the structure of the tax at issue to see whether its identical application by every State in the Union

would place interstate commerce at a disadvantage as compared with commerce intrastate.' . . . By hypothetically assuming that every State has the same tax structure, the internal consistency test allows courts to isolate the effect of a defendant's State tax scheme." Wynne, 135 S. Ct. at 1802, quoting Jefferson Lines, supra. See Container Corp. of Am., supra ("[an] obvious[] component of fairness in an apportionment formula is what might be called internal consistency -- that is, the formula must be such that, if applied by every jurisdiction, it would result in no more than all of the unitary business'[s] income being taxed"). In Wynne, the Court concluded that the Maryland income tax scheme failed the internal consistency test, and thereby violated the dormant commerce clause, because it hypothetically resulted in double taxation of the income of Maryland residents that was earned outside the State.[4] Wynne, supra at 1803-1804.

We understand the Supreme Court's order of remand in this case as a directive to consider further whether the Massachusetts FIET, as applied to Gate, fails the internal consistency test discussed and affirmed in Wynne, and thereby

_____

[4] The Maryland income tax structure hypothetically would also result in double taxation of nonresidents who earned income in Maryland. See Comptroller of the Treasury of Md. v. Wynne, 135 S. Ct. 1787, 1803-1805 (2015) (Wynne).

contravenes the dormant commerce clause.[5] We have done so, and conclude that the Massachusetts tax scheme, as applied to Gate, satisfies the test.

General Laws c. 63, § 2A (§ 2A), sets out the rules for apportioning the taxable income of financial institutions between or among the States in which the institutions operate. As stated in First Marblehead, the rules "allocate the income to the Commonwealth for tax purposes by multiplying the taxpayer's income by the 'apportionment percentage' that is 'determined by adding the taxpayer's receipts factor, property factor and payroll factor together and dividing the sum by three.'" First

---

[5] In its appeal to this court in The First Marblehead Corp. v. Commissioner of Revenue, 470 Mass. 497 (2015) (First Marblehead), Gate included a claim that the Massachusetts financial institution excise tax (FIET), as the Appellate Tax Board (board) had construed it, violated the due process clause and the commerce clause of the United States Constitution. See id. at 511-512. We rejected Gate's constitutional claims, and in doing so, considered the Supreme Court's internal consistency test in relation to the FIET as applied to Gate. Id. at 512-513. We noted that as applied to an apportionment formula such as set out in the statute at issue here, G. L. c. 63, § 2A (§ 2A), the internal consistency test requires that "the [apportionment] formula must be such that, if applied by every jurisdiction, it would result in no more than all of the unitary business'[s] income being taxed" (quotation and citation omitted). Id. at 512. However, we then made an observation about Gate's actual tax liability that, although factually true, may have implied that we understood the internal consistency test to be satisfied if the taxpayer did not suffer double taxation in fact. See id. at 512-513 & n.27. We recognize that, as Wynne reaffirms, 135 S. Ct. at 1802, hypothetical rather than actual tax liability is the relevant consideration under the internal consistency test.

Marblehead, 470 Mass. at 502, quoting § 2A (b).[6]  In Gate's case, the only factor in dispute is the property factor.  The rules for determining a financial institution's property factor are set out in § 2A (e), and the rules governing loans in particular are in § 2A (e) (vi).  Under that subsection, the general rule is that a "loan is properly assigned to the regular place of business with which [the loan] has a preponderance of substantive contacts."  G. L. c. 63, § 2A (e) (vi) (A) (2).  More specifically, a loan is properly assigned to the Commonwealth "if it is properly assigned to a regular place of business of the taxpayer within the [C]ommonwealth," G. L. c. 63, § 2A (e) (vi) (A) (1); and a loan is properly assigned to a jurisdiction outside the Commonwealth if it is assigned to a "regular place of business" in that other jurisdiction and the taxpayer's records and tax returns generally reflect the same assignment.  See § 2A (e) (vi) (A) (2).  If a loan is assigned by the taxpayer to a place outside the Commonwealth that is not a "regular place of business," the statute creates a presumption, rebuttable by the taxpayer, that the loan is properly assigned to the Commonwealth if, at the time the loan was made, the taxpayer's "commercial domicile" was in

---

[6] In Gate's case, however, because Gate had no employees, it had no payroll factor.  Accordingly, its "apportionment percentage" was derived by dividing Gate's combined receipts factor and property factor by two.  See First Marblehead, 470 Mass. at 500 n.6.

Massachusetts.  See § 2A (e) (vi) (B).  Finally, both "regular place of business" and "commercial domicile" are defined terms in the statute.[7,8]

Here, because Gate had no offices or employees in Massachusetts, or any other State or location, in the relevant tax years, it had no "regular place of business" as the term is defined in the FIET statute (see note 7, supra).  As a result, Gate had no regular place of business for purposes of assigning the loans either to the Commonwealth under § 2A (e) (vi) (A) (1) or to a jurisdiction outside the Commonwealth under § 2A (e) (vi) (A) (2).  Although Gate assigned loans to Florida in its Massachusetts tax returns, the board rejected this assignment and applied the statutory presumption in § 2A (e) (vi) (B) that the preponderance of substantive contacts regarding those loans was located in the Commonwealth.  First Marblehead, 470 Mass.

---

[7] "Regular place of business" is defined as "an office at which the taxpayer carries on its business in a regular and systematic manner and which is consistently maintained, occupied and used by employees of the taxpayer."  G. L. c. 63, § 1. "Commercial domicile" is defined in relevant part as the "headquarters of the trade or business, that is, the place from which the trade or business is principally managed and directed."  Id.

[8] The apportionment formula in G. L. c. 63, § 2A, is based on a model statute proposed by the Multistate Tax Commission, see First Marblehead, 470 Mass. at 502 & n.12, and we are informed by the Commissioner of Revenue (commissioner) that the formula has been adopted in substantially the same form in thirteen States:  Alabama, Arkansas, California, Hawaii, Kansas, Maine, Maryland, Mississippi, New Mexico, Ohio, Oregon, Rhode Island, and Utah.

508, 513 n.27. The board did so because Gate's commercial domicile is located in the Commonwealth and because the board found as a factual matter that Gate failed to rebut the statutory presumption. Id. at 498, 505. The result was that one hundred per cent of Gate's loans were assigned to the Commonwealth. Id. at 504. We agreed with the board that § 2A (e) (vi) (B)'s presumption applied to Gate, although for somewhat different reasons. See First Marblehead, 470 Mass. at 504-509.

This result does not contravene the internal consistency test. An example will illustrate the point. Assume that another State -- for example, Florida -- is the taxing State and that Florida has enacted a statute identical to § 2A. As stated in the previous paragraph, Gate has no regular place of business in any State, including Florida, and therefore, there is no statutory basis to assign any loan to Florida as the taxing State under § 2A (e) (vi) (A) (1), and no statutory basis to assign any loan to any other State under § 2A (e) (vi) (A) (2). First Marblehead, supra at 504-505. Turning to subsection § 2A (e) (vi) (B), the question is whether, apart from a regular place of business, there is a State in which "the preponderance of substantive contacts" relating to the loan occurred, within the meaning of § 2A (e) (vi) (C). If every State follows the interpretation of § 2A (e) (vi) (C) that this court adopted

in First Marblehead, supra at 508-510 -- a result that seems required for purposes of considering the internal consistency test, given that § 2A is a Massachusetts statute -- Gate could not establish that there is another State in which the preponderance of substantive loan-related contacts occurred. This is so because although § 2A (e) (vi) (C) requires "the facts and circumstances regarding the loan at issue [to] be reviewed on a case-by-case basis" in determining whether the preponderance of substantive contacts connect a loan to a particular State, the statutory factors listed and defined in that section to be taken into account in conducting the individual case review do not apply to Gate, with its lack of employees and office locations.[9]  Accordingly, the default presumption in § 2A (e) (vi) (B) -- that the taxpayer's commercial domicile defines the place where "the preponderance of substantive contacts regarding [the] loan occurred" --

---

[9] The factors that are listed and defined in § 2A (e) (vi) (C) are "the solicitation, investigation, negotiation, approval and administration of the loan," see § 2A (e) (vi) (C) (1)-(5), often referred to as the "SINAA factors."  See First Marblehead, 470 Mass. at 507 & nn.20-21.  Gate has agreed that the first four of these factors have no application to it because it was not involved in loan origination.  See id. at 507-508.  With respect to loan administration, we have interpreted and continue to interpret the definition of this term in § 2A (e) (vi) (C) (5) as not applying to Gate as a factual matter because the factor looks to where the loan is administered by the taxpayer's employees, and Gate did not have any employees:  the entities that serviced Gate's loans were separate corporations or public agencies.  See id. at 508-509.

applies.  Because Gate's commercial domicile is Massachusetts, the numerator of Gate's property factor in Florida would be zero -- i.e., no loans assigned to Florida -- which means mathematically that its property factor as a whole would also be zero.  See First Marblehead, supra at 504 & n.15.  Assuming that § 2A were in effect in every other State, the same analysis would apply to the property factor calculation for Gate in each such State.  The exception is Massachusetts, Gate's commercial domicile.[10]

Gate contests this conclusion.  It argues that if Florida -- a State to which Gate in fact did assign loans on its Massachusetts return -- had § 2A (e) (vi) as its tax statute, and Gate filed a tax return in Florida, Florida would treat the loans that Gate assigned to that State as properly assigned

---

[10] As the commissioner argues, this result means that in the hypothetical exercise called for by the internal consistency test, Gate would not be subject to tax on more than one hundred per cent of its income.  In particular, as explained in First Marblehead, 470 Mass. at 500 & n.7, Gate's apportionment percentage in Massachusetts -- given its uncontested receipts factor of two per cent and its uncontested lack of a payroll factor -- was fifty-one per cent:

(2% receipts factor + 100% property factor)/2 = 51%

If all other States' hypothetical apportionment percentages are calculated together, the collective result is a forty-nine per cent apportionment factor:

(98% receipts factor + 0% property factor)/2 = 49%

The total income subject to tax, therefore, is one hundred per cent.

because § 2A (e) (vi) provides no basis for the reassignment of the loans to Massachusetts. The difficulty with this argument is that, as just discussed, there is no proper statutory basis in § 2A for Gate to assign loans to Florida. We reject a claim that the Massachusetts apportionment formula, as we have construed it, violates the internal consistency test when the claim is premised on the taxpayer's erroneous application of the formula in the first instance.[11]

Gate also contends that § 2A (e) (vi) violates the internal consistency test because it deprives Gate of any way to rebut the presumption in § 2A (e) (vi) (B). We disagree. The internal consistency test examines a tax structure to ensure that it "would result in no more than all of the unitary business'[s] income being taxed," Container Corp. of Am., 463 U.S. at 169, and is designed to help identify tax structures that discriminate against interstate commerce by "look[ing] to the structure of the tax at issue to see whether its identical

---

[11] As for Gate's argument that § 2A (e) (vi) offers no basis on which Florida could properly reassign the loans to Massachusetts, as explained, the statute, properly interpreted, would call for the presumption in § 2A (e) (vi) (B) to apply in the instance of a taxpayer like Gate that has no employees or offices but does have a commercial domicile. As counsel for the commissioner stated in oral argument, this same result would obtain in Massachusetts if we were to assume that Florida were Gate's commercial domicile -- that is, there would be no basis provided by § 2A (e) (vi) to assign any loans to Massachusetts, and Gate's property factor in calculating the Massachusetts FIET would be zero.

application by every State in the Union would place interstate commerce at a disadvantage as compared with commerce intrastate."  Wynne, 135 S. Ct. at 1802, quoting Jefferson Lines, 514 U.S. at 185.  Here, as just discussed, if § 2A (e) (vi) were in effect in every State, no more than one hundred per cent of Gate's income would be subject to tax, and there is no disadvantage to Gate that derives from operating in interstate commerce as opposed to wholly in intrastate commerce -- if Gate operated solely in Massachusetts, there would be no apportionment of Gate's income available at all.  Section 2A (e) (vi), as applied to Gate, did not violate the internal consistency test or, more generally, the dormant commerce clause.[12]

> Decision of the Appellate
> Tax Board affirmed.

---

[12] Gate's inability to rebut the presumption in § 2A (e) (vi) (B) is principally a consequence of its holding company status.  Under the FIET, if Gate believed that application of § 2A (e) (vi) to it was "not reasonably adapted to approximate the net income derived from business carried on within the [C]ommonwealth," Gate was free to request the commissioner "to have its income derived from business carried on within this [C]ommonwealth determined by a method other than set forth in [§ 2A (a)-(f)]."  G. L. c. 63, § 2A (g).  Gate did not choose to follow that path.  See First Marblehead, 470 Mass. at 510.